UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-20350-CR-MARTINEZ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHANNA MICHELY GARCIA,

    Defendant.

_____/

## SENTENCING MEMORANDUM

Johanna Michely Garcia, through undersigned counsel, files the following memorandum to assist the Court in determining an appropriate sentence in this case. Ms. Garcia prays that the below information, including her personal story, her culpability relative to her partner, Pavel Ruiz—who received a sentence of **110 months imprisonment**—and her ongoing efforts to begin to make up for her harms, assists the Court in fashioning a sentence that is sufficient but not greater than necessary.

**I. Ms. Garcia's Personal History & Characteristics**

In many ways, business ownership seemed an unlikely path for Johanna Garcia. She was raised by immigrant parents who struggled tremendously to provide for her and her three brothers. Things were incredibly difficult for the family of six—periods of time with their utilities disconnected and many days with little to eat. As her childhood friend, **Elizabeth Gomez, describes, "Johanna and I were always there for each other, if one of our parents didn't pay the water bill then we**

1

would shower at the other's house. If we didn't have enough to eat then we would make food for the other person."

When Johanna was just five years old, a relative began to sexually abuse her; this abuse continued for years, and Ms. Garcia suffered in silence, keeping the secret and trauma to herself well into adulthood. By the age of 14, Johanna was working to help the family make ends meet—attending class by day and cleaning office buildings alongside her mother at night. By her sophomore year of high school, this grueling schedule proved too much; with her family still struggling, Johanna was forced to leave school in order to go to work fulltime. Instead of enjoying youthful fun, she worked tirelessly, perpetually anxious about bills and rent and responsibilities beyond her years.

At the age of 19, Johanna got married. She hoped marriage would be a positive turning point, a source of love and stability. But the marriage would not last long; her husband was violent and abused Johanna both emotionally and physically.

In the years that followed, Johanna worked to rebuild. In between shifts, she took online classes, and in 2008, at the age of 25, Ms. Garcia earned her GED—a hard fought accomplishment. She then found employment at Humana, a national HealthCare company. For the next years, Ms. Garcia experienced the financial stability, the independence and, most importantly, the peace that had once seemed beyond her reach. During that time, Ms. Garcia, who had taken courses on tax preparation, started her own company, MJ Taxes. That was a proud moment for her,

though nothing compared to the birth of her two sons, Javier, now age 10 and JonCarlo, age 6.

Then, in 2018, things started to fall apart. Ms. Garcia was laid off from her job at Humana. Determined to provide for herself and her children, she poured her all into her fledgling tax business. And for that time, she did provide tax services and, later, through related companies, legitimate merchant cash advances—loans which served as lifelines to struggling small businesses.

In the years that followed, however, Ms. Garcia's genuinely impressive perseverance in overcoming significant odds, and her honest intentions, would be overcome by her incredibly poor choices and many missteps.

## II.     The Nature & Circumstances of the Offense

Ms. Garcia deeply regrets her actions in this case. And she knows that she is before the Court, facing significant consequences, based on her own misdeeds. She takes full responsibility and will spend the rest of her life trying to make up for the harms she has caused. The following information is important not because it excuses Ms. Garcia's conduct but because it provides an honest accounting of her role and culpability in this conspiracy.

On paper, Ms. Garcia was at the head of the company. And at the beginning of their partnership, Ruiz did, in fact, operate below Ms. Garcia. But before long, Ruiz took on a leading role and soon became an uncontrollable, aggressive force, surpassing Ms. Garcia where it counted—not on paper, but in the criminal conspiracy.

As reflected in the discovery, and by his own account, Ruiz implemented the affiliate marketing program to incentivize account representatives and spur investments—the figurative lighter fluid supercharging the scheme—he signed merchant agreements, and he collected funds in accounts to which only he had access.

**Ruiz managed, by far, the greatest number of account representatives—those directly responsible for soliciting and signing up investors.** Indeed, he supervised nearly three times as many account representatives as did Ms. Garcia:

| BOARD MEMBER | ACCOUNT REPS |
|---|---|
| Pavel Ruiz | 121 |
| Christian Cuesta | 93 |
| Bryant Guayara | 55 |
| Joel Castellanos | 55 |
| Johanna Garcia | 48 |
| Mario Morales | 32 |
| Marco Rosas | 28 |
| Carlos Rivillas | 16 |
| Jose Mendez | 9 |
| Leonardo Azevedo | 8 |
| Nathalia Burgos | 0 |

**Ruiz also brought in the greatest number of investors—and benefited disproportionately as well.** While Ms. Garcia bore the brunt of the business costs, Ruiz, overwhelmingly, enjoyed its fruits, spending staggering sums—well beyond those spent by Ms. Garcia—on apparel, travel entertainment, and cryptocurrency.

4

Tellingly, while those who invested with Ms. Garcia by and large received their returns and suffered no actual loss, **Ruiz was responsible for the greatest dollar amount of losses.**

| BOARD MEMBER | INVESTMENT (INFLOW / CREDITS) | INVESTMENT (OUTFLOW / DEBITS) | NET |
|---|---|---|---|
| Pavel Ruiz | 54,786,222 | 25,654,371 | $ (29,131,850.73) |
| Christian Cuesta | 26,079,627 | 10,342,107 | $ (15,737,519.52) |
| Bryant Guayara | 7,085,844 | 7,477,665 | $ 391,820.92 |
| Joel Castellanos | 24,585,601 | 24,987,853 | $ 402,252.95 |
| Johanna Garcia | 14,837,053 | 15,995,180 | $ 1,158,127.58 |
| Mario Morales | 3,357,400 | 2,089,522 | $ (1,267,878.02) |
| Marco Rosas | 5,854,743 | 3,343,140 | $ (2,511,603.05) |
| Carlos Rivillas | 3,601,000 | 3,755,160 | $ 154,160.00 |
| Jose Mendez | 3,881,955 | 6,084,212 | $ 2,202,257.00 |
| Leonardo Azevedo | 5,754,559 | 5,270,104 | $ (484,454.74) |
| Nathalia Burgos | 38,025 | 61,000 | $ 22,975.00 |
| Blank | 27,606,877 | 4,309,669 | (23,297,208) |

### III. Rehabilitation & Starting to Make Amends

In the years since, Ms. Garcia has sought—at times in ill-conceived ways—to come to terms with the harm she has caused, and to begin to make amends with and restore those her actions hurt the most.

Notably, in 2021, when investors filed a class action suit against Wells Fargo Bank for its deceptive and unlawful practices that had helped to conceal the fraud, Ms. Garcia authorized her then-counsel to reach out to the plaintiffs' counsel and, over months and through numerous proffers, provided invaluable information—information that led to a $26.6 million recovery for the investors. **As James Sallah, class counsel for the plaintiff investors writes, "I am confident that we could not have procured the settlement amount, which was distributed by the Court-Appointed Receiver to victims, but for Ms. Garcia's proactive and**

**consistent assistance in providing material facts that were likely only known to her."**

Ms. Garcia assisted in the criminal investigation as well. Though she was anxious and afraid, at the government's request—and without any kind of promise of protection—she wore a wire and captured incriminating statements by Pavel Ruiz. Ultimately, confronted by his own words captured on recording and his actions uncovered by investigators, Ruiz pleaded guilty. That was not the end of Ms. Garcia's cooperation; she has proffered additional information to assist the government.

Ms. Garcia's conduct in the New Beginnings venture, though deeply misguided and plainly wrong, was motivated by a desire to pay back her former investors. And though a circuitous path, it has led here with Ms. Garcia taking full responsibility for her actions, not challenging the sum for restitution or the even greater sum of forfeiture.

**At 41 years old, Ms. Garcia is a true first-time offender, having never once been arrested prior to this case.** This conviction transforms her into a convicted felon and has forever changed her life and the lives of her family and loved ones. Ms. Garcia nevertheless has chosen to face those consequences and while her path to this point has been complicated to say the least, her conduct over the past year demonstrates her commitment to rehabilitation. In addition to doing everything in her power to continue to be an involved mother, daughter, sister, and friend, despite her physical absence, Ms. Garcia has dedicated herself to bettering herself at FDC, despite the limited opportunities available to her. She has worked while in

custody at FDC Miami, including as a unit orderly, and has completed numerous classes and programs, from the Suicide Watch Companion Training and Program, multiple parenting courses, and Preparing for Success after Prison, to health, trauma, and practical skills classes, and more. A sampling of Ms. Garcia's certificates are attached to this memorandum.

Ms. Garcia also presents a very low risk of recidivism. **First time offenders like Ms. Garcia are the least likely to reoffend and have considerably lower recidivism rates than people with even one criminal history point.** *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. **Additionally, non-violent fraud offenders are the least likely to recidivate of any category.** *Id.* And people in middle age or older are at a significantly lower rate to reoffend as well. *Id.* Taken together, Ms. Garcia presents a very low risk of recidivism. And it's not just the data—Ms. Garcia's efforts at bettering herself and to begin to make up for her harms also demonstrate to the Court that she is committed to doing the work necessary to be a productive, law-abiding member of her community upon her release.

### IV. Avoiding Unwarranted Sentencing Disparities

Pavel Ruiz, described *by the government* at Ruiz's sentencing hearing as Ms. Garcia's "partner"—not subordinate—in this business and most importantly in this offense, received a sentence of **110 months** imprisonment. This sentence took into account Ruiz's "egregious" conduct in this conspiracy and beyond, as he—according

to government—continued "victimizing" people, and hid and spent enormous amounts of stolen money even "while . . . negotiating a plea agreement with [the government]." As detailed above, Ruiz was not just Ms. Garcia's partner; he was, in many of the ways that matter, more culpable than she was. In light of Ruiz's sentence, sentencing Ms. Garcia at or even near the guidelines range as calculated in the PSI would cause a significant unwarranted sentencing disparity in this case.

Moreover, according to the United States Sentencing Commission's Judiciary Sentencing Information (JSIN), for individuals sentenced under USSG § 2B1.1 *with an advisory sentencing guideline range of life*, the median sentence length was 180 months. That *excludes* individuals who received a downward departure under USSG § 5K1.1 for substantial assistance. All of which is to say, even if the Court overrules Ms. Garcia's PSI objections, a guideline sentence is still disproportionate and would create significant unwarranted sentencing disparities, even before consideration of the other critical 18 U.S.C. § 3553(a) factors.

## V. Conclusion

For the above reasons, Ms. Garcia, through counsel, humbly submits that a sentence below the advisory sentencing guideline range as calculated in the PSI is sufficient but not greater than necessary to serve the important goals of sentencing.

Respectfully Submitted,

HECTOR A. DOPICO
FEDERAL PUBLIC DEFENDER

By: */s/ Kate Taylor*
Kate Taylor
Assistant Federal Public Defender
Special Bar No. A5502484
150 West Flagler Street, Suite 1700
Miami, Florida 33130
Tel: 305-530-7000
Email: kate_taylor@fd.org

By: */s/ Eboni Blenman*
Eboni Blenman
Assistant Federal Public Defender
Special Bar No. A5502989
150 West Flagler Street, Suite 1700
Miami, Florida 33130
Tel: 305-530-7000
Email: eboni_blenman@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on November 27, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                */s/ Kate Taylor*
                                                Kate Taylor