UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-20350-CR-MARTINEZ

UNITED STATES OF AMERICA

v.

JOHANNA GARCIA,

       **Defendant.**

_____/

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

      The United States of America respectfully submits this sentencing memorandum for the Court's consideration. For years, Defendant Johanna Garcia spearheaded two aggressive fraud *Ponzi* schemes, through which she and her family personally profited at least $7.5 million. Her profit was not coincidental, but rather by design; the point of the complex conspiracy that blossomed at MJ Capital and later New Beginning Capital was to enrich Garcia, her family members, and her co-conspirators at the expense of victim investors. This Court should sentence Defendant Johanna Garcia to 240 months' imprisonment to punish her for her significant criminal misconduct, to protect the public from further crimes of this recidivist, and deter others from committing similar economic crimes. The evidence overwhelmingly shows that Garcia was the leader/organizer of the two *Ponzi* schemes that defrauded over 15,400 victims out of an actual loss amount of nearly $90 million. Garcia controlled all aspects of both fraud schemes including, most importantly, nearly all of the many bank accounts that received the victims' money.

      The true nature of Defendant Garcia's criminality is shown by her actions and words. First, she operated MJ Capital, which stole nearly $200 million from thousands of victims. She oversaw a "board of directors" and a sales force of over 400 agents that she used to pilfer. MJ Capital was shut down by the FBI and SEC in August 2021, but right after personally witnessing agents storm

1

her then office building and haul away duffle bags containing over $1.3 million in cash, Garcia and her family of fraud did not stop their criminal enterprise. Undeterred, Garcia began another fraud mill, ironically called New Beginning Capital Funding. Just two months later, Garcia used the same playbook of lies for money, claiming to use victim funds for a legitimate purpose (business loans), but, again, running a *Ponzi* scheme. FBI agents arrested her in August 2023, two years into this second fraud scheme. Even the most brazen criminals stop committing crimes upon arrest, but not Johanna Garcia. As clearly demonstrated by her jailhouse recordings, emails, and other evidence, Garcia continued leading her criminal band, directing them to witness tamper on more than one occasion, obstruct justice, move money, and pay off prior investors with new investor money. She did this after claiming indigency with the Court, "qualifying" for a public attorney, and operating after the issuance of several U.S. District Court asset freeze orders.

Garcia now seeks a sentence below the 240 months' imprisonment through her Sentencing Memorandum (DE 67). The Court should deny her sentencing variance request for several reasons. First, her level of criminality leaves no unwarranted sentencing disparity between her co-conspirator, Pavel Ruiz, who, like all of the other agents in these fraud schemes, was a lower-level employee whom Garcia directly managed. Next, nearly all of the letters and statements Garcia relied upon in her Sentencing Memo are made by unindicted co-conspirators who either helped Garcia directly steal money from hundreds of victims, directly profited from Garcia's ill-gotten criminal gains, or both.

### **GUIDELINES CALCULATIONS IN GARCIA'S PSI**

The PSI (DE 61) calculates Garcia' base offense level as 7, pursuant to U.S.S.G. § 2B1.1(a)(1) (PSR ¶ 107). Twenty-six (26) levels are added, pursuant to § 2B1.1(b)(1)(N), because the loss was more than $150,000,000 but less than $250,000,000 (PSR ¶ 108) (however, the

Government is seeking a level that is one lower than this, as mentioned in its Response to Defendant's Objection to PSI (DE 68); Six (6) additional levels are added because the offense involved a substantial financial hardship to 25 or more victims, pursuant to § 2B1.1(b)(2)(C) (PSR ¶ 109). Two (2) additional levels are added pursuant to § 2B1.1(b)(9)(C) because Garcia violated a prior, specific administrative or judicial order (PSR ¶ 110). Two additional levels are added pursuant to § 2B1.1(b)(10)(C) because the defendant's conduct constituted sophisticated means (PSR ¶ 111). The PSI also provides a four-level enhancement for Garcia's role as an organizer or leader, pursuant to § 3B1.1(a) (PSR ¶ 113); a two-level enhancement because she knew, or should have known, the offense targeted at least one vulnerable victim, in accordance with § 3A1.1 (PSR ¶ 112); and an additional two-level enhancement because Garcia willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, pursuant to § 3C1.1. Probation determined that Garcia has accepted responsibility for her criminal conduct, and that acceptance was timely (PSR ¶¶ 117-18), and that her total offense level is 43 (PSR ¶ 1119). That would correspond to life based upon the sentencing table. Should the Court apply the lower loss figure, then the total offense level would be 41, which would leave a guidelines range of 324 to 405 months' imprisonment. However, as the advisory range is in excess of the statutory maximum based on the plea agreement, which is 20 years' imprisonment, the recommended guidelines range is 240 months' imprisonment (PSR ¶ 165).

**20 YEARS' IMPRISONMENT IS WARRANTED BASED ON THE § 3553(a) FACTORS AND THE SPECIFIC CIRCUMSTANCES OF THIS CASE.**

To fashion an appropriate punishment, this Court must consider not only applicable sentencing guidelines but must also assess statutory factors listed in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence to reflect the seriousness of the offense, promote respect

3

for the law, provide just punishment and adequate deterrence, protect the public, and provide the defendant with needed training or treatment. 18 U.S.C. § 3553(a)(1)-(2). The Court must also consider the types of sentences available, the sentencing guidelines and policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(3)-(7). It is significant whether the alleged reason to vary concerns a fact outside the heartland of what a specific guideline already covers; variances will attract "the greatest respect" when the case falls outside the heartland of the guidelines. *United States v. Irey*, 612 F.3d 1160, 1202 (11th Cir. 2010) (en banc). Here, the Defendant identifies no extraordinary circumstances to support a variance she demands.

### a. The seriousness of the conduct and the need to promote respect for the law:

Garcia's crime is in the category of the most serious financial crimes a person can commit. Garcia's fraud scheme targeted all types of unsophisticated investors, in devastating and prolonged fashion. Its complexity is notable, even when compared to other financial crimes and *Ponzi* schemes. Garcia recruited others into her ever-expanding scheme, and, for the purpose of making her own life easier, stole the life savings of others, forcing some to go back to work in order to recoup their investments. Another facet of her crimes revealing a strong need to sentence her to a substantial term of imprisonment is the fact that Garcia repeatedly circumvented, and enlisted others to help her circumvent the SEC's asset freeze, by operating a subsequent *Ponzi* scheme through New Beginning. Nor did her obstructive behavior and asset depletion cease with her arrest. While in custody at the Federal Detention Center, Garcia continued her criminal misconduct. The prosecution team acquired the best evidence of Garcia's contemptuous behavior by obtaining her telephone recordings and emails. The three main, extraordinary facets of Garcia's in-custody behavior were: (1) directing her co-conspirators to pressure the then 84-year-old victim

4

and his daughter, S.A., to change their testimony, (2) directing her co-conspirators on how to minimize the adverse effects to their New Beginning *Ponzi* scheme (who and how to pay, for example), and (3) directing her co-conspirators on accessing frozen assets, in clear violation of the asset freeze order, injunction, and repugnant to her sworn claims of indigency to the Magistrate Court.

Accordingly, the guidelines accurately reflect the seriousness of Garcia's egregious conduct. Indeed, because of the parties' negotiated plea agreement, a sentence of the statutory maximum of 20 years' imprisonment is far below what the guidelines would ordinarily recommend for a crime of this magnitude and seriousness: level 43, life imprisonment or 41, 324 to 405 months' imprisonment.

b. **The need to avoid unwarranted disparities with similarly situated offenders:**

A guidelines sentence is necessary to avoid unwarranted disparities with defendants who have committed crimes of similar scope. The Government respectfully requests the Court to consider:

- *United States v. Robert Shapiro*, No. 19-CR-20178-ALTONAGA (S.D. FL. 2019) (sentencing defendant to 20 years imprisonment for defrauding thousands of victims in *Ponzi* scheme, and an additional consecutive 5 years' imprisonment for tax evasion).

- *United States v. Edwin Fujinaga*, No. 2:15-cr-00198-GMN-NJK (D. Nev. June 17, 2019) (D.E. 338) (following trial, sentencing defendant to 50 years' imprisonment for his role in spearheading a fraud and $1.12 billion *Ponzi* scheme, which involved approximately 10,000 Japanese victims).

- *United States v. Norman Schmidt*, 594 F.3d 1270, 1272 (10th Cir. 2010) (sentence of 330 months for defendant who orchestrated *Ponzi* scheme with investor losses of approximately $40 million deemed reasonable; defendant was sentenced post-trial).

- *United States v. Arthur Lamar Adams*, No. 3:18-cr-00088-CWR-LRA (S.D. Miss. Nov. 8, 2018) (D.E. 21) (sentencing organizer and leader of approximately $165 million Ponzi scheme, involving approximately 200-300 investor victims, to 27 years' (325 months' imprisonment) following entry of guilty plea).

5

- *United States v. Kevin Merrill*, No. 1:18-cr-00465-RDB-1 (D. Md. Oct. 11, 2019) (D.E. 146) (sentencing organizer/leader of estimated $396 million *Ponzi* and fraud scheme to 22 years' (240 months') imprisonment, following entry of plea agreement; defendant's wife was also involved, and unlike here, she was also charged and convicted).

- *United States v. Antonio Carlos De Godoy Buzaneli*, No. 0:17-cr-00284-MJD-HB (D. Minn. Apr. 10, 2019) (D.E. 132) (following guilty plea, sentencing defendant, who was also a South Florida man, and who spearheaded an approximately $150 million *Ponzi* and investment fraud scheme involving Brazilian factoring, to 20 years' (240 months') imprisonment, and to pay restitution of approximately $51 million).

- *United States v. Raymond Montoya*, No. 18-10225-GAO (D. Mass. Mar. 25, 2019) (D.E. 44-46) (sentencing defendant who spearheaded $38 million Ponzi scheme to 175 months' imprisonment following guilty plea, where guidelines range was 210-262 months).

- *United States v. Lee Loomis*, No. 12-cr-00315-JAM (E.D. Cal. Oct. 5, 2018) (D.E. 699) (following guilty plea, sentencing defendant who spearheaded approximately $10 million *Ponzi* scheme to 12 years' (144 months') imprisonment, in case involving approximately 183 investor victims).

In formulating its sentencing recommendation, the United States has also considered sentences imposed in the following white collar cases in this District, some of which involved less serious conduct, in terms of duration and victim impact, as compared to the conduct at issue here:

- *United States v. Leonard Bogdan*, No. 05-14090-CR-Martinez (S.D. Fla.) (sentence of 360 months involving investment fraud with approximately 191 victims and loss of approximately $11.5 million).

- *United States v. Darryl Burke*, No. 13-20616-CR-Cohn (S.D. Fla.) (sentence of 360 months in connection with bank fraud involving more than $7 million in losses for numerous fraudulent mortgages).

- *United States v. Domenico Rabuffo*, No. 14-20008-CR-Moore (S.D. Fla.) (sentence of 327 months in connection with bank fraud involving more than $27 million in losses for numerous fraudulent mortgages and approximately 50 victims).

- *United States v. Monte Grow*, No. 16-CR-20893-FAM (S.D. Fla.) (sentence of 262 months for pharmacy fraud involving $39 million loss to Medicare).

- *United States v. Serge Francois*, No. 16-20399-CR-Gayles (S.D. Fla.) (sentence of 204 months for owner of pharmacy involving $30 million fraud loss).

- *United States v. Jose Carlos Morales*, No. 12-20644-CR-Lenard (S.D. Fla.) (sentence of 144 months for owner of pharmacy who pleaded guilty to health care fraud involving a loss of $23 million).

Here, the victims were mostly unsophisticated investors, setting this case apart from many investment frauds, and the victims numbered in the thousands, not hundreds.

### c. The need for specific and general deterrence:

The Eleventh Circuit has explicitly emphasized the significance of "general deterrence . . . in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308-09 (11th Cir. 2014); *see also, e.g.*, *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th Cir. 2013) (vacating, as substantively unreasonable, sentence of time served, which represented a 57-month downward variance, for defendant responsible for $3 million health care fraud scheme, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and that "[w]e are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence."), *cert. denied*, 134 S. Ct. 140, 187 L. Ed. 2d 38 (2013). Although Garcia has no criminal history, estimates suggest that more than seventy percent of fraud offenders, which includes the vast majority of white-collar offenders, have little or no criminal history. *See* Selected Sentencing, Guideline Application, and Demographic Information for § 2B1.1 Offenders, Fiscal Year 2012, U.S. SENT'G COMM'N (Sept. 18, 2013).

This suggests a particular need to deter those in the community who lead otherwise law-abiding lives, but, like Garcia, chose to commit fraud for years, without getting caught. Moreover, courts have also found that, in the context of white collar crime, positive employment history is no mitigating factor, particularly where, as here, the employment history enabled and/or served as the vehicle for the offenses of conviction. *See, e.g.*, *United States v. Whitehead*, 559 F.3d 918, 921

(9th Cir. 2009) (Gould, K., dissenting from denial of rehearing *en banc*) ("We can hardly be surprised if a white collar criminal has a good employment history – otherwise, he or she would likely not be in a position to commit the crime.").

### d. **Garcia's sentencing variance arguments are unpersuasive.**

Garcia devotes much of her sentencing memorandum arguing that Pavel Ruiz was more culpable than she was. She is wrong. Pavel Ruiz may have managed some other MJ Capital Sales Agents but Johanna Garcia managed everyone, including Ruiz. Garcia's Sentencing Memo claims that she was only the head of the fraud scheme "on paper." This statement is simply untrue and unsupported by the overwhelming evidence. The evidence shows that Defendant Garcia controlled all aspects of the MJ Capital and New Beginning fraud schemes. Garcia was the owner/CEO of MJ Capital. Witnesses who worked at MJ Capital established that she set the policies. Internal emails discussing, among other things, employment policies, came directly from Garcia. Garcia was the face of MJ Capital. She featured prominently on MJ Capital's webpage and the investment pitch was that her tax clients formed the foundation of MJ Capital's purported MCA business. The MJ Capital website page said it best: "MJCF derives from the founder's name. Her name is Johanna Michely Garcia, but she is known as Johanna Garcia. She is the owner of all the MJ entities. MJ Remodeling, MJ Capital Funding, MJ Realty, MJ Enterprise, MJ Lounge (coming soon) And Finally the parent company, MJ Tax Services and More, which is the paternal company to all other MJ entities." The internal MJ Capital Funding organization chart listed Johanna Garcia as "President, Day to Day Operations/Legal." Also, all of the corporate filings for the MJ Capital companies list Defendant Garcia as President.

Pavel Ruiz did raise money from investors, and those workers under him did bring in close to $60 million in victim funds. But what happened to that money after he and his lower-tiered

agents took it from victims is key. If Ruiz did have a higher level of control than Defendant Garcia, then common sense dictates that he would have dispersed it to himself and his co-conspirators. This is not what happened. Of the $58.8M calculated for the raise by Ruiz and his team, $51.5M of it was deposited to accounts in Johanna Garcia's control, over which Pavel did not have signature authority. In other words, he sent that money to his boss, Garcia, the one and only leader of the MJ Capital fraud scheme. And what truly shows the ultimate level of power Defendant had over the schemes, is how Garcia controlled and maintained signature authority of nearly all of the many bank accounts that received victim money. Twelve accounts received nearly 100% of investor funds, and Garcia had signature authority on all of them. Nearly all disbursements from these accounts were bank checks, and Garcia signed all of these checks (nearly 70,000 bank checks). Pavel Ruiz did not sign the checks because he simply could not. The bank drafts required authorization and signature by the President of MJ Capital, Johanna Garcia.

Other bank transactions in this case were Zelle payments and receipts, and Garcia used her cell number or email address to control that money. Again, Pavel Ruiz did not issue millions of payments to anyone. Moreover, several voice messages made by Garcia to her co-conspirators direct them how and when to dispense victim funds. Similarly, text messages from her show the same level of direction and control. As far as bank deposits and Zelle payments, Garcia received emails from her employees confirming each transaction. Garcia kept track of all money, Pavel Ruiz did not. Thus, all money led to Garcia-controlled bank accounts, and all disbursements were made and controlled by Defendant Garcia. Garcia had several co-conspirators but she was clearly the top person at MJ Capital and New Beginning. She was the leader and organizer of both fraud schemes. No one else came close to her level of control. Thus, as with most fraud schemes, those with a higher degree of leadership and control receive a higher degree of punishment.

Garcia's sentencing memo also claims that she should receive a lower sentence because Ruiz spent a lot of the fraud proceeds on himself. But Garcia neglects to mention how she personally profited from this scheme. Johanna Garcia directly benefitted at least $7.22 million through receipt of investor funds directly to her personal bank accounts and transfers from the MJ Accounts to her personal accounts. She also used victim money to fund her and her family's life style, in automobile payments, the purchase of a Cadillac Escalade, travel, dining, entertainment, recreation, and luxury apparel, including Coach, Fendi, and Louis Vuitton. Credit card payments alone for her personal cards and cards of her friends and family amounted to approximately $605,000. These are just a few examples of her receipt of victim funds and spending the money on herself.

The Court should not be persuaded by the letters submitted by Garcia for her sentencing variance request. Of those letters, each and every friend and relative received some direct benefit from Garcia's crimes and/or participated in the fraud schemes themselves. Elizabeth Gomez was the HR director at MJ Capital and sent out many of the policy emails on behalf of Johanna Garcia. Gomez currently owns and operates the Goddess Beauty & MedSpa, which was established by Garcia during the MJ Capital fraud scheme. Not only did Garcia sign the lease for the spa space, she wrote checks from her personal account, which was funded by investor dollars, for the spa's rent during the scheme. This Defendant received $1800 from the spa in February to March 2022. And Gomez also received over $75,000 in victim funds from Garcia. Another example, Giovanny Martinez Jr. – Garcia's brother, was an "account rep" for MJ Capital under Garcia before becoming a Board Member responsible for Accounting/Finance. Moreover, he directly received over $40,000 in fraud proceeds from Garcia. Finally, Modesto Canales is Garcia's uncle that received

over $142,000 of MJ Capital and New Beginning funds. There should be little doubt as to why these and other family and friends "support" Garcia.

Finally, the Defendant claims that she "cooperated with law enforcement" and "wore a wire" against another criminal charged with her first fraud scheme, Pavel Ruiz. This is half accurate. While Garcia, on one occasion, did agree to wear a recording device to record Ruiz, she in no way cooperated with law enforcement or captured incriminating statements against Ruiz. The truth is that while she pretended to assist the FBI in its investigation, Garcia, along with Ruiz, were actually continuing to defraud new and repeat victims in the New Beginning fraud scheme. While they were raking in millions from victims using the same manner and means of the later indicted conduct, Garcia pretended to try to assist the FBI. Garcia merely pretended to attempt to elicit incriminating statements from Ruiz. Garcia's single recording was definitely not used at all by the Government to charge Ruiz or anyone else. Moreover, Garcia should be given no credit for assisting a plaintiff's attorney in civilly extracting a settlement from a bank that Garcia used to steal money from investors. The letter from Attorney James D. Sallah claims that Garcia "provided information" through her attorney that assisted the civil attorney in his case. The letter provides zero facts as to what information the second-hand knowledge was. More importantly, while the civil attorney may have relied on this information in his case, this information was in no way used by the Government in its case against anyone. Therefore, it should not be considered by this Court in adjusting the sentence of this Defendant in this criminal case.

## **CONCLUSION**

For the foregoing reasons, the Court should overrule Defendant Garcia's requested sentencing variance. The United States further requests that the Court sentence Garcia to 20 years'

imprisonment, in accordance with the advisory guidelines range, and to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   */s/ Roger Cruz*
ROGER CRUZ
Assistant United States Attorney
Florida Bar No. 1008370
United States Attorney's Office
99 NE 4th Street
Miami, Florida 33132
Tel: (305) 961-9207
Email: Roger.Cruz@usdoj.gov

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By:   */s/ Roger Cruz*
Roger Cruz